Shalini Dogra *(Admitted Pro Hac Vice)*
shalini@dogralawgroup.com
DOGRA LAW GROUP PC
2219 Main Street, Unit 239
Santa Monica, CA 90405
Telephone: (747) 234-6673
Facsimile: (310) 868-0170
*Attorneys for Named Plaintiff and Proposed Class*

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| DALIT COHEN, individually herself and on behalf of all others similarly situated; <br><br> Plaintiff, <br><br> v. <br><br> SARAYA USA, INC., a Utah Corporation; and DOES 1 through 50, Inclusive, <br><br> Defendants. | Case No: <br><br> **PLAINTIFF'S CLASS ACTION COMPLAINT** <br><br><br> **DEMAND FOR JURY TRIAL** |

Plaintiff Dalit Cohen individually and on behalf of all others similarly situated (the "Class" as defined below), by and through her undersigned counsel, brings this Class Action Complaint against Saraya USA, Inc. ("Defendant Saraya") and respectfully alleges as follows. Plaintiff bases the allegations herein on personal knowledge as to matters related to, and known to, Plaintiff. As to all other matters, Plaintiff bases the allegations on information and belief, through investigation of her counsel. Plaintiff believes substantial evidentiary support exists for her claims, and she sees a reasonable opportunity for discovery:

## NATURE OF THE ACTION

1. To capitalize on the premium price consumers are willing to pay for forms of sweeteners that purportedly lack the harmful side effects of traditional sugar, Defendants intentionally make false and misleading representations about their "Lakanto Monkfruit Sweetener" product line. Defendants further deceive consumers about their sugar substitutes to take advantage of diabetics, as well as individuals who are seeking out healthier forms of desserts and sweet foods.

2. Aware that consumers place a higher value on alternatives to sugar that can sweeten food without the negative impact that is typically associated with sugar, including weight gain and exacerbation of diabetes, Defendants deliberately make false and misleading statements about the nutritional value and health benefits of their "Lakanto Monkfruit Sweetener" product line, which contains two types/flavors of sugar substitutes: "golden" and "classic" ("the Products").

 

3. Defendants consistently label and advertise the Products as "ZERO NET CARBS," and "ZERO CALORIE," In reality, neither of these claims about the Products are true because the Products are neither zero net carbs, nor zero calories.

4. Furthermore, during the relevant time period, Defendants furthered their deceptive practices by marketing the Products with incorrect and manipulated serving sizes. Defendants knowingly used unreasonably small serving sizes that fail to account for the manner in which consumers actually use the Products. Defendants knew and had multiple reasons to know that they had predicated their marketing scheme for the Products on illegitimate small serving sizes. First, the serving size of four grams that that Defendants used during the relevant time period for the Products

is lower than the "reference amount that is customarily consumed"(RACC) required by federal and state law. Second, Defendants purposely take steps to motivate consumers to use amounts of the Products that exceed the serving size that Defendants have listed on the Products' nutritional panel. Consequently, Defendants purposely mislead consumers into thinking that the Products lack the harmful side effects of sugar, and thereby increase profits at the expense of unsuspecting individuals.

5. At all relevant times, Defendants packaged, advertised, marketed, distributed and sold the Products to consumers at retail store locations throughout New York and the United States based on the misrepresentation that the Products were "zero net carbs," and "zero calorie." In reality, the Products do not confer any of these purported nutritional and health benefits to consumers. The Products actually are not zero net carbs or zero calorie.

6. Reasonable consumers rely on product labelling in making their purchasing decisions. When a consumer sees a substitute sweetener labelled as "zero calories," and "zero net carbs," especially in combination with statements that emphasize the sugar ratio, and claims regarding keto approval and zero glycemic, she reasonably expects the sugar replacement to be calorie free and free from net carbohydrates. Likewise, consumer will reasonably conclude, based on the Products' labeling scheme, that they can eat servings of the Product without the result side-effect of ingesting net carbohydrates or calories. In reliance on Defendants' misleading marketing and deceptive advertising practices for the Products, Plaintiff and similarly situated class members reasonably thought they were purchasing a substitute sweetener alternative to sugar that provided these nutritional benefits and value for the human body. In fact, neither Plaintiff nor any of the member of the putative class received any of the health benefits, nutritional value or food composition they reasonably thought they were buying.

7. Plaintiff and other consumers purchased the Products because they reasonable believed, based on Defendants' packaging and advertising that the Products provided certain health benefits and helped avoid particular physiological harms, including the detriments typically associated with conventional sugar. Had Plaintiff and other consumers known that the Products actually lacked the nutritional value and health benefits that were advertised on the Products' front

labels and packages, including that the Products were not actually "zero calories" nor "zero net carbs," they would not have purchased the Products or would have paid significantly less for them. As a result, Plaintiff and other similarly situated class members have been deceived and suffered economic injury.

8. Defendants' labelling, marketing and advertising uniformly involves multiple false and misleading statements, as well as material omissions of fact, concerning the Products that have injured Plaintiff and the class by tricking them into buying a sugar substitute product and alternative sweetener that is entirely different from what they sought at the time of purchase.

9. Based on the fact that Defendants' advertising misled Plaintiff and all others like them, Plaintiff brings this class against Defendants to seek reimbursement of the premium she and the Class Members paid due to Defendants' false and deceptive representations about the serving size, health impact and nutrient content levels of the Products.

10. Plaintiff seeks damages, other monetary relief, declaratory relief, and an order enjoining Defendants from continuing their false and misleading marketing of the Products.

## **PARTIES**

11. Plaintiff is a resident of New York, and lives in the city of Roslyn, in Nassau County of New York, within the Eastern District of New York.

12. Defendant Saraya is a corporation headquartered in the State of Utah, with its principal place of business at 553 East Timpanogos Circ. Bldg., G, Ste. 23, Orem, Utah 84097. Defendant Saraya manufactures, mass markets, and distributes the Products throughout New York and the United States.

13. Plaintiff is informed and believes, and based thereon alleges that at all times relevant herein each of these individuals and/or entities was the agent, servant, employee, subsidiary, affiliate, partner, assignee, successor-in-interest, alter ego, or other representative of each of the remaining Defendants and was acting in such capacity in doing the things herein complained of and alleged.

14. Plaintiff reserves her right to amend this Complaint to add different or additional defendants, including without limitation any officer, director, employee, supplier, or distributor of

1  Defendants who has knowingly and willfully aided, abetted, or conspired in the false and deceptive
2  conduct alleged herein.

## JURISDICTION AND VENUE

4  15.  This Court has original subject matter jurisdiction over this proposed class action pursuant to the Class Action Fairness Act of 2005, Pub. L. No. 109-2 Stat. 4 (codified in scattered sections of Title 28 of the *United States Code*), under 28 U.S.C. § 1332(d), which provides for the original jurisdiction of the federal district courts over "any civil action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and [that] is a class action in which….any member of a class of plaintiffs is a citizen of a State different from any defendant." 28 U.S.C. § 1332(d)(2)(A). Because Plaintiff is a citizen of New York, and Defendants are a citizen of Delaware and Utah, at least once member of the plaintiff class is a citizen of a State different from Defendant Saraya. Further, Plaintiff alleges the matter in controversy is well in excess of $5,000.000.00 in the aggregate, exclusive of interest and costs. Finally, Plaintiff alleges "the number of members of all proposed plaintiff classes in the aggregate" is greater than 100. *See* 28 U.S.C. § 1332(d)(5)(B).

16.  This Court has personal jurisdiction over Defendants for reasons including but not limited to the following: Plaintiff's claims arise out of Defendants' conduct within New York, including Defendants' dissemination of false and misleading representations about the Products in New York.

**Venue**

17. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2). A substantial part of the events or omissions giving rise to Plaintiff's claims occurred within this District, including Plaintiff's purchases of the Products based on Defendants' dissemination of false and misleading information about the nature, quality, nutrition and ingredients of the Products.

## ALLEGATIONS COMMON TO ALL CLAIMS FOR RELIEF

18.  Consumers often purchase sugar substitutes to avoid the harmful side effects of traditional granulated white table sugar. The trend towards sugar replacements and alternative forms of sweeteners has grown as more studies continue to emerge about the dangers of sugar.

Additionally, especially as diabetes rates increase throughout the nation, the demand for sugar replacements is swelling, so that diabetics can eat sweet without worsening their condition. Defendants knew or had reason to know that consumers would find the challenged attributes important in their decision to purchase the Products, as indicated by the fact that Defendants repeatedly emphasizes the advertised claims prominently on the front labels of the Products' packaging in capital letters and an eye-catching font that quickly garners a consumer's attention. Defendants consistently advertise the Products as "ZERO NET CARBS," and "ZERO CALORIE." However, Defendants' labelling and marketing scheme for the Products is false.

19. Defendants understand that obesity, non-alcoholic fatty liver disease, and diabetes are rising health epidemics and that consumers, concerned about their health and appearance, are willing to pay more for products with reduced calories and carbohydrate levels. Likewise, market studies have found that the global demand for ketogenic food products will reach $12.35 billion in 2024, with an annual growth rate of 5.3% between 2021 and 2024. Roberts, Tobias, "*Keto Diet Market Growth Forecasts for 2021-2024*," BUSINESS STATISTICS (Feb. 22, 2023). Hence, the claims of "zero net carbs," and "zero calorie" are important to individuals. Sales for monk fruit-based sugar items, such as the Products, rose by seventy percent between 2021 and 2022. Krawiec, Sebastian, "*Alternative sweetener options grow as consumers demand less sugar,*" Nutritional Outlook, Vol. 26, issue 5 (Aug. 15, 2023). Accordingly, Defendants have embarked on a long-term advertising campaign to mislead the public into believing that the Products are healthier alternatives to sugar, with purportedly zero net carbs, and zero calories.

20. When people see the statement "zero calorie" predominantly emphasized on a food item's front label, as Defendants have done with the Products here, they will reasonably conclude that the food item can be eaten without ingesting any calories. Similarly, when individuals see the claim "zero net carbs" that Defendants advertise on the Products' front label, they will think that the Products have no net carbohydrates. As explained above, consumers value foods that have zero net carbs and zero calories.

21. Products are not low in carbohydrate concentration, nor do they yield a net zero carbohydrate nutritional value. In actuality, the Products contain about one net carbohydrate per

1  gram, and about 116 net carbohydrates per each bag of the Products. Moreover, data results have demonstrated that four grams of the Products contain sixteen calories and four net carbohydrates, while an entire bag of the Products yields 464 calories, and 116 net carbohydrates. Notably, these findings refute the information Defendants present on the Products' nutritional panel, where Defendants misrepresent four grams of the Products as being zero calories. Furthermore, it does not matter that the FDA allows manufacturers to round 5 or less calories down to zero. Here, a four-gram serving of the Products has sixteen calories, while the RACC of eight grams has thirty-two calories. Hence, a serving size of four grams or eight grams has more than five calories. Thus, regardless of whether Defendants used a serving size of four or eight grams, FDA would not permit Defendants to market the Products as "zero calorie," or "calorie free."

22. If Defendants followed the FDA's parameters for the RACC of sugar substitutes and used the agency's mandatory minimum serving size to ascertain the Products' nutritional values, then the Products would not actually be "zero calorie," or "zero net carbs." For example, the FDA limits "zero calorie" claims to food items that contain less than five calories per serving. *See* 21 C.F.R. § 101.9(c)(1). Here, eight grams of the Products would have more than five calories and not meet the FDA's qualifications for the "zero calorie" labels. Likewise, even if the FDA permitted Defendants to use a serving size of four grams for the Products' nutritional panel, the Products' "zero calorie," and "net zero carb" claims would remain untrue. By manipulating the Products' serving size, Defendants have doubled-down on their ability to deceive and continue to mislead consumers about the Products' health benefits and risks.

23. Based Defendants misrepresentations, reasonable consumers are misled into thinking the Products have zero net carbs and zero calories. Likewise, due to Defendants' false advertising and deceptive " "zero net carb," and "zero calorie" claims, reasonable consumers are tricked into buying and/or paying more for units of the Products.

24. Additionally, Defendants know that consumers will foreseeably devour more than four grams of the Products and end up digesting a volume and quantity of the Products that lacks all the advertised claims.

25.     As part of the FDA's labelling requirements, a food's nutritional facts and content disclosures must be based on a serving size that reflects an amount that is "customarily consumed." *See* 21 U.S.C. § 343(q)(1)(A)(i). The FDA has established distinct "reference amount customarily consumed (RACC)" for certain foods, whereby a food producer must use a minimum serving size equal to the FDA's determined RACC to calculate its corresponding food item's nutritional values. *See* 21 C.F.R. §§101.9(b)(2) and 101.9(b)(6). Aside from the fact that the FDA has set the RACC for food items like the Products at twice as much as the serving size of four grams that Defendants' used for the Products, Defendants themselves encourage consumers to use more than four grams of the Products. Similarly, Defendants encourage consumers to eat more than eight grams of the Products per serving. Many of the recipes Defendants promote on their website for the Products require substantially more than four grams, as well as more than eight grams of the Products. Therefore, Defendants have sufficient notice that individuals will consume multiple servings of the Products, and foreseeably eat amounts of the sugar substitutes that are not "zero calories, or "zero net carbs." Notably, the FDA has expressed a preference to base serving sizes on actual consumption habits and the Nutrition Labeling and Education Act ("NLEA") similarly requires that serving sizes reflect the amounts people actually eat. Accordingly, based on federal guidelines, Defendants have reason to know that they are using an improper serving size for the Products, and that the Products' front-panel labeling scheme is false and deceptive.

26.     As demonstrated by the independent test results, detailed more comprehensively throughout this complaint, if consumers used the amount of the Products that Defendants encourage by way of their advertising and online marketing, the consumers would end up digesting a quantity of sugar substitute that is not "zero calories," or "zero net carbs." Defendants know this, and still deliberately continue to perpetuate a deceptive advertising and marketing scheme for the Products.

27.     Defendants' representations on the Products' packaging and on Defendants' website for the Products are designed to trick consumers into believing they can use the Products as a sugar substitute and not ingest any calories or carbohydrates. But this is not the case. Separate studies have shown that four grams of the Products contain 4.8 grams of net carbohydrates, i.e., nearly one gram more than what Defendants represent on the Products' packaging. Furthermore, independent

tests have also shown that four grams of the Products contain five calories. These findings demonstrate that the four grams of the Products are not "zero calorie" as Defendants advertise throughout the Products' labelling and nutritional panel. Likewise, these data results, as well as the findings discussed in preceding paragraphs, indicate that even if the RACC or lawful serving size for the Products was four grams, the Products' front label claims of "zero calorie" and "zero net carbs" would still be false. Similarly, if Defendants used the legitimate RACC of eight grams that the FDA has established for the Products, then the "zero calorie" and "zero net carbs" claims that Defendants advertise on the Products' front label would still be false. Hence, even after Defendants changed the Products' nutritional panel to reflect a serving size of eight grams, the Products' "zero calorie," and "zero net carb" labelling claims remain false, deceptive and misleading.

28. If Defendants felt that the Products did not appropriately fit in any categories of the FDA's Serving Size Table, Defendants are still not permitted to choose whatever serving size they wish. Instead, the correct choice would have been for Defendants to have filed a petition to request a new serving size be created. Defendants did not so. Notably, even if they had, it is unlikely such a petition would be granted. Such a petition requires data that demonstrates that the new subcategory would be consumed in amounts different enough from the reference amounts for other products in the category, as required by 21 C.F.R.§101.12(f)(13). Defendants do not have any such data. Yet, Defendants know that the FDA permits food markets to round down to zero when a product contains less than five calories. 21 C.F.R. §§101.60(b)(1)(i), 101.62(b)(1)(i). And so, during the relevant time period, Defendants tried to use a serving size for the Products that would fall below this five-calorie threshold. Notably, as detailed in paragraphs above, the serving size Defendants erroneously picked actually contains too many calories to qualify for this five-calories threshold. Furthermore, this information and data does not support or justify granting Defendants an amended serving size under FDA regulations. Even if Defendants had used a serving size that complied with federal and correlative state regulations, the Products' nutritional value would not equal "zero calorie" or "zero net carbs."

29. Pursuant to 21 C.F.R. §101.12(h), if a food manufacturer is unable to select any of the reference categories from the FDA's "Serving Size Table," as set forth in 21 C.F.R. § 101.12(a)(7),

the manufacturer must contact the FDA with evidence to support its serving size to have its serving size approved. *see also* 58 F.R. 2273. Defendants did not take any steps to exercise any of the potential options permitted under 21 C.F.R. §101.12(h) or contact the FDA to seek approval of a "four grams serving size" for the Products. The FDA has determined an explicit RACC level the Products. Under 21 C.F.R. §101.12, the RACC for sugar replacements such as the Products is eight grams. Hence, Defendants must base the Products' nutritional content values on a minimum serving size of eight grams. Yet, as made clear by the Products' back panel, during part of the relevant time period, Defendants have relied on a serving size of four grams, one-half of the minimum amount required by the FDA.

30. The FDA requires food manufacturers to list certain material facts on the packaging of their products. Under 21 C.F.R. §2.1(a), food labels are deemed misleading if the labels fail to reveal facts that are either (1)"material in light of other representations made or suggested; or (2)"material with respect to consequences which may result from use of the [labeled food] under...conditions of use as are customary or usual." Here, Defendants were required to disclose information about the presence of calories, and carbohydrates, due to the customary or usual conditions under which the Products are used (and Defendants recommend and encourage the Products to be used) and the fact that Defendants know that the calorie and carbohydrate content is material to consumers, as Defendants have themselves decided to place that information on the front of the Products' packaging.

31. As a sugar and sweetener substitute, consumers use significantly more than four grams and eight grams of the Products, so customary consumption is never "zero net carbs," or "zero calories." Defendants know consumers customarily use more than four grams, and more than eight grams, of the Products per serving. Indeed, Defendants encourage it. As consumers are not food scientist, and cannot test products to determine their calorie count or carbohydrate levels, consumers cannot determine if the product they are purchasing is actually zero calories or zero net carb.

32. Here, the Products' front labels exhibit at least two nutrient content claims: "zero calorie," and "zero net carbs." Both of these claims, regardless of whether Defendants use a four-gram or eight-gram RACC. Similarly, irrespective of what serving size is reflected in Products'

nutritional panel, eight grams or four grams, the advertising on the Products' front panel is false and misleading. As demonstrated by independent studies referenced above, quantity of either four grams of the Products and eight grams of the Products both had more than five calories and carbohydrates per amount. Here, Defendants manipulated the Products' RACC in an unlawful manner. Even if Defendants had accurately relied on the correct and lawful serving size of eight grams for the Products when they tallied their monk fruit sweeteners' carbohydrate levels, the resulting measurements would have belied the Products' front "zero net carb" and "zero calorie" labels. Likewise, if the FDA based the Products' serving size on the amount that Defendants encourage consumers to eat, i.e., more than eight grams per serving, then the "zero net carbs" and "zero calories" labeling scheme would still be untruthful and misleading.

33. Defendants' marketing, labelling, and packaging of the Products are designed to, and do in fact, deceive, mislead and defraud consumers. Defendants have no reasonable basis for labelling, advertising, marketing and packaging the Products as being beneficial to health or an innocuous sugar substitute that is especially safe for diabetics. As a result, consumers are consistently misled into purchasing the Products for the commonly known and/or advertised benefits and characteristics when in fact no such benefits could be conferred by the Products. The malicious actions taken by Defendants caused significant harm to consumers. Plaintiff and similarly situated class members who purchased the Products because they reasonably believed, based on Defendants' marketing, packaging, labelling and advertising schemes, that the Products were in fact zero net carbs and zero calorie. Thus, Plaintiff was economically harmed by Defendants' misbranding, false labelling, deceptive marketing and misleading packaging of the Products. The value of the Products that Plaintiff actually purchased and consumed was materially less than its value as misrepresented by Defendants.

34. Plaintiff purchased units the Products from supermarket and brick-and-mortar retail locations, including "Target" and "Walmart" in Long Island, New York, throughout the last three years and during the relevant time period.

35. Plaintiff bought and consumed the Products because, based on Defendants' marketing and labelling scheme, she believed that the Products were in fact zero net carbs, and zero

calorie. Plaintiff purchased the Products in reliance upon the nutritional and health benefits that Defendants advertised and marketed throughout the Products' labelling, and packaging, without knowledge of the fact that the Products perpetuated a were not actually zero net carbs or zero calorie. Plaintiff consumed the Products as intended and would not have purchased units the Products if she had known that the advertising as described herein was false, misleading and deceptive.

36. During the time when they were purchasing and consuming the Products, Plaintiff did not take steps to verify the Products' components or nutrient levels. Reasonable consumers such as Plaintiff would not have considered it necessary to verify the clear message conveyed by Defendants' labelling, advertising, marketing and packaging of the Products.

37. Plaintiff would consider purchasing the Products again if the labelling were accurate.

## RELIANCE AND ECONOMIC INJURY

38. When purchasing units of the Products, Plaintiff sought a sugar replacement product that yielded zero net carbohydrates and zero calories.

39. Plaintiff red and relied on Defendants' false and misleading labeling in purchasing units of the Products, including the representation that the sugar replacement was "zero calories" and "zero net carb."

40. Plaintiff would not have purchased units of the Products absent these misrepresentations.

41. Instead of receiving a product that was "zero calories" and "zero net carbs," Plaintiff received a sugar replacement that in reality whose nutritional value equaled more than zero calories and more than zero net carbohydrates.

42. Plaintiff lost money as a result of Defendants' deception because Plaintiff did not receive the product she sought to purchase.

43. Plaintiff altered her position to her detriment and suffered damages as a consequence of purchasing units of the Products.

44. Plaintiff would purchase units of the Products again in the future, should the product have the nutritional value, including the calorie and net carbohydrate claims, that Defendants advertise and label.

45. By engaging in the false and misleading marketing set forth herein, Defendants reaped, and continue to reap, increased sales and profits.

46. Defendants are familiar with marketing research and know that many of their customers purchase the Products because they believe that the Products are zero calories and zero net carbs. Defendants know this quality is material to a consumer's decision to purchase the Products.

47. Defendants deliberately capitalize on foreseeable consumer misconceptions about the Products' crackers in their marketing and sales scheme.

## CLASS ACTION ALLEGATIONS

48. Pursuant to Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, Plaintiff brings this action individually and on behalf of a proposed class (the "Injunctive Relief Class") defined as follows:

> **The Injunctive Relief Class.** All persons residing in the New York and its territories who have purchased a unit of the Products for their own use (which includes feeding their families), and not for resale since October 9, 2016. Plaintiff asks the Court to adjudicate only liability, declaratory relief, and injunctive relief through the Injunctive Relief Class; the Injunctive Relief Class does not seek any form of monetary relief.

49. Additionally, pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, Plaintiff brings this action individually and on behalf of a proposed class (the "Monetary Relief Class") defined as follows:

> **The Monetary Relief Class**. All persons residing in the State of New York and its territories who have purchased units of the Products for their own use (which includes feeing their families), and not for resale, since October 9, 2016. Plaintiff asks the Court to adjudicate all remedies through the Monetary Relief Class.

50. Collectively, the Injunctive Relief, and. the Monetary Relief are the "Class" or the "Classes."

51. Excluded from the Class are: (a) Defendants, Defendants' board members, executive-level officers, and attorneys, and immediately family members of any of the foregoing persons; (b)

governmental entities; (c) the Court, the Court's immediately family, and the Court staff; and (d) any person that timely and properly excludes himself or herself from the Class in accordance with Court-approved procedures.

52. Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of their claims on a class-wide basis using the same evidence as individual Class Members would use to prove those elements in individual actions alleging the same claims.

53. **Numerosity**. The Class each consists of many thousands of persons, throughout the State of New York, as appropriate. Each Class is so numerous that joinder of all members is impracticable, and the disposition of each Class's claims in a class action will benefit the parties and the Court.

54. **Commonality and Predominance**. Common questions of law and fact predominate over any questions affecting only individuals Class members. These common questions have the capacity to generate common answers that will drive resolution of this action. These common questions include, but not limited to, the following:

   a. Whether Defendants contributed to, committed, or are responsible for the conduct alleged herein;
   b. Whether Defendants conduct constitutes the violations of law alleged herein;
   c. Whether Defendants acted willfully, recklessly, negligently, or with gross negligence in the violations of law alleged herein;
   d. Whether Plaintiff and the Class Members are entitled to injunctive relief;
   e. Whether Plaintiff and the Class members are entitled to restitution and damages.

55. Because they saw the name, labeling and marketing of the Products, and because they purchased units of the Products, all Class Members were subject to the same wrongful conduct.

56. Absent Defendants' material deceptions, misstatements, and omissions, Plaintiff and the other Class Members would not have purchased units of the Products.

57. **Typicality**. Plaintiff's claims are typical of the claims of the Class because Plaintiff and the other Class Members all purchased units of the Products and were injured thereby. The

claims of Plaintiff and the Other Class Members are based on the same legal theories and arise from the same false and misleading conduct.

58. **Adequacy of Representation**. Plaintiff is adequate representative of the Class because her interests do not conflict with those of the other Class members. Each Class member seeks damages reflecting a similar and discrete purchase, or similar and discrete purchases, that each Class member made. Plaintiff has retained competent and experienced class action counsel who intend to prosecute this action vigorously. Plaintiff and her counsel will fairly and adequately protect the Class Members' interests.

59. **Injunctive or Declaratory Relief**. The requirements for maintaining a class action pursuant to Rule 23(b)(2) are met, as Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

60. **Superiority**. A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all Class members is impracticable. The amount at stake for each Class member, while significant, is such that individual litigation would be inefficient and cost-prohibitive. Additionally, adjudication of this controversy as a class action will avoid the possibility of inconsistent and potentially conflicting adjudication of the claims asserted herein. Plaintiff anticipates no difficulty in the management of this action as a class action.

61. **Notice to the Class.** Plaintiff and her counsel anticipate that notice to the proposed Class will be effectuated through recognized, Court-approved notice dissemination methods, which may include United States mail, electronic mail, Internet postings, and/or published notice.

**FIRST CLAIM**

**Violation of New York's Consumer Protection from Deceptive Acts and Practices Act**

**N.Y. GEN. BUS. LAW §349** *et seq.*

**New York General Business Law Section 349**

62. Plaintiff repeats each and every allegation contained in the paragraphs above and incorporates such allegations by reference herein.

63. Plaintiff brings this claim on behalf of a New York class for violation of section 349

of New York's Consumer Protection from Deceptive Acts and Practices Act, N.Y. GEN. BUS. LAW § 349 *et. seq.*

64. Section 349 prohibits "deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service." N.Y. GEN. BUS. LAW § 349(a).

65. Defendants' labeling and marketing of the Products, as alleged herein, constitute "deceptive" acts and practices, as such conduct misled Plaintiff and the other members of the New York Class as to the Products' caloric and nutritional value, as well as the Products' health benefits and risks.

66. In accordance with subsection (h) of section 349, Plaintiff seeks an order enjoining Defendants from continuing these unlawful deceptive acts and practices. Absent enjoining these unlawful deceptive acts and practices, Defendants will continue their false and misleading marketing of the Products' nutritional value and health impacts, and in doing so, irreparably harm each of the New York class members.

67. As a consequence of Defendants' deceptive acts and practices, Plaintiff and other members of the New York class suffered an ascertainable loss of monies. By reason of the foregoing, Plaintiff and other members of the New York class also seek actual damages or statutory damages of $50.00 per violation, whichever is greater, as well as punitive damages. N.Y. GEN. BUS. LAW §349(h).

68. Therefore, Plaintiff prays for relief as set forth below.

## SECOND CLAIM

**Violation of New York's Consumer Protection from Deceptive Acts and Practices Act**

**N.Y. GEN. BUS. LAW §349** *et seq.*

**New York General Business Law Section 350**

69. Plaintiff repeats each and every allegation contained in the paragraphs above and incorporates such allegations by reference herein.

70. Plaintiff brings this claim on behalf of a New York Class for violation of section 350 of New York's Consumer Protection from Deceptive Acts and Practices Act., N.Y. GEN. BUS. LAW § 349 *et. seq.*

71. Section 350 prohibits "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service." N.Y. GEN. BUS. LAW § 350.

72. New York General Business Law section 350-a defines "false advertising" as "advertising, including labeling of a commodity, or of the kind, character, terms or conditions of any employment opportunity if such advertising is misleading in a material respect." N.Y. GEN. BUS. LAW § 350-a. The section also provides that advertising can be false by omissions, as it further defines "false advertising" to include "advertising [that] fails to reveal facts material in the light of such representations with respect to the commodity….to which the advertising relates." *Id*.

73. Defendants' labeling, marketing and advertising of the Products, as alleged herein, are "misleading in a material respect," and thus "false advertising," as they falsely represent the Products as being zero calories and zero net carbs.

74. Plaintiff seeks an order enjoining Defendants from continuing this false advertising. Absent enjoining this false advertising, Defendants will continue to mislead Plaintiff and the other members of the New York class as to the nutritional value and calorie count of the Products, and in doing so, irreparably harm each of the New York class members.

75. As a direct and proximate result of Defendants' violation of New York General Business Law section 350, Plaintiff and the other members of the New York class have also suffered an ascertainable loss of monies. By reason of the foregoing, Plaintiff and the other members of the New York class also seek actual damages and punitive damages.

76. Therefore, Plaintiff prays for relies as set forth below.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of the member of the Class, respectfully request the Court to enter an Order:

A. Certifying the proposed Class under the Federal rule of Civil Procedure 23(a), (b)(2), and (b)(3), as set forth above;

B. Declaring that Defendants are financially responsible for notifying the Class members of the pendency of this suit;

C. Declaring that Defendants have committed the violations of the law alleged herein;

D. Providing for any and all injunctive relief the Court deems appropriate;

E. Awarding statutory damages in the maximum amount for which the law provides;

F. Awarding monetary damages, including but not limited to any compensatory, incidental, or consequential damages in any amount that the Court or jury will determine, in accordance with applicable law;

G. Providing for any and all equitable monetary relief the Court seems appropriate;

H. Awarding punitive or exemplary damages in accordance with proof and in an amount consistent with applicable precedent;

I. Awarding Plaintiff her reasonable costs and expenses of suit, including attorneys' fees;

J. Awarding pre- and post-judgment interest to the extent the law allows; and

K. For such further relief as this Court may deem just and proper.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: October 30, 2023

Respectfully Submitted,

By: _____
Shalini Dogra, Esq.
shalini@dogralawgroup.com
Dogra Law Group PC
2219 Main Street, Unit 239
Santa Monica, CA 90405
Telephone: (747) 234-6673
Facsimile: (310) 868-0170
*Attorneys for Plaintiffs*